The United States Bankruptcy Appellate Panel is now in session. The Honorable Judges Lafferty, Brandt, and Corbett presiding. Okay. Good morning or good afternoon, depending on where one sits in relation to Greenwich Meantime. This is phase two of this month's sitting of the Bankruptcy Appellate Panel of the Ninth Circuit. A couple of introductory notes, I'll introduce the panel. I'm Judge Lafferty. I sit for my day job in Northern District, California, Oakland Division. My colleague, Julia Brandt, sits in the Central District of California. And my colleague, Frederick Corbett, sits in the Eastern District of Washington. Couple of notes before we get going. Obviously, this is a Zoom hearing, and I don't know if any of you folks have done VAP Zoom hearings before. We've had a very good track record of success. We are greatly aided by some fabulous technical folks in the Ninth Circuit who support this and who never let us down. A couple of notes in case things do go sideways. This has never happened. If we lose an attorney, we will make heroic efforts to have that person reconnect and join us. If those are not successful, we will confer about rescheduling as best we can and as soon as we can. If we lose one judge, which again has never happened, our protocol is that we will finish the argument for the convenience of counsel. The argument is recorded, and we will promise you that the judge who is disconnected will hear the entire argument before consulting with us and before we then dispose of the matter. But again, those are lovely things that have never happened, so I assume that we're going to be equally blessed today. Welcome to the session. I think you guys, you counsel, are quite experienced here, so I'll just say quickly what we always say at the beginning of these. We've read the briefs. We've read the record. We've talked about your matter. We've compared notes. We've asked each other questions. We can't possibly know it as well as you do, so we will look forward to your wonderful arguments and your educating us. As we tell every time, the most important thing you can do is answer our questions as directly and quickly as you can. As I'm sure you guys know, questions are not a hindrance. They either emanate from we literally don't know something and we need you to tell us, or we're giving you an indication where we may not be quite where you would like us to be in terms of the positions that we're taking on a matter, and we need you to help us see it your way. So when you get a question, please do answer it as directly and as quickly as you can. And with that, I will just remind the appellant here that since they have the burden of convincing us there was a significant mistake made below, you get to have the last word. Mr. Brown, you want to reserve some time? Yes, please, Your Honor. You know what? I'm ahead of myself here because we needed to call this matter. Go ahead, Courtroom Clerk, and call the matter. Yes, Judge. N. Ray, Pacific Links, U.S. Holdings, Incorporated. Kenit H. Brown, Counsel for the Appellant Tianjin Dinghu Hongjun Equity Investment Partnership, Christopher J. Muzzy, Counsel for the Appellees, Pacific Links, U.S. Holdings, Incorporated, and others. Okay, so Mr. Brown, go ahead and make your appearance. Your Honor, this is Kenneth Brown from the Petrulski Stang Law Firm. On behalf of, and I'm embarrassed to say, it's difficult for me to pronounce the name of my client. Well, we won't know if you're wrong, so. We'll call them TDH. How's that? That's a good idea. That's a really good idea. Okay, and Mr. Brown, would you like to reserve some time? I would like to reserve. I'd like to start with 10 minutes for my initial. Okay, so you'll reserve five. Okay, so there is a clock, which is our official clock that you can probably see on the screen. We will try to remind you if you're getting close to your time, but ultimately, Mr. Brown, it's up to you to decide when to stop, okay? Appreciate it. Thank you very much. Okay. Okay, good morning, Your Honors, and good morning, Judge Lafferty. We practice up in the same part of the state, so. First off, I want to acknowledge at the outset that I don't think there is any experienced bankruptcy lawyer and certainly no bankruptcy judge that I've come across that can look at these transactions that have been litigated here and determine that they do not deserve close scrutiny. So, you know, I would be destroying my credibility if I said this did not deserve a very close look and even a dose of skepticism. And clearly, the bankruptcy court had more than a dose of skepticism about this. Well, and just to, you were, you have the benefit and the curse of not having been involved initially, right? You're picking this up. That is correct. I was not trial counsel. I was solely in connection with the appeal. Right, right, right, right. Benefit and a curse. Right. Probably more of the second. Okay. But skepticism is not enough to avoid fraudulent transfers. And the bankruptcy court was required to be guided by the allocated burdens of proof and to adhere to the federal rules of evidence. It failed to do this, and the record doesn't support its key factual findings. And for this reason, the findings below, the key, the critical findings on inadequate capitalization, belief that they, that appellees couldn't pay their debts as they became due, and good faith are all defective. First point that I want to emphasize, the appellees did not present evidence to meet their burden of proof on inadequate capitalization and that they intended to incur or believe they would incur debts beyond their ability to pay. There isn't evidence in the record to establish that the appellees knew on or before the closing date of the second transaction, which was December 11, 2019, that they believed that the equity infusions from Asia were going to cease or fail to cover the expenses needed to operate and continue the development. Just, there isn't evidence in the record of any precision that they knew before the deal was done and the obligation was incurred and the transfers were made. My question is, how precise does it need to be? You know, for example, we're talking about the adequate capital test, which is short of cash flow insolvency. It is, you know, that they had, didn't have, wouldn't have enough capital to reasonably believe that they could continue their business. So, it seems to me you're saying that it's like kind of a laser pinpoint knowledge that has to occur on a specific date, but that test would imply more of a continuum, which is what I thought the evidence was here, that there was some knowledge in October that infusions were going to slow down and stop. There was no evidence in October that the infusions were going to stop. Clearly, there was evidence in the record and the reality was that it was becoming more difficult to move, to get money out of China. That was the reason why the second transaction was done. But this, this thing was, you know, it was an enterprise. The owner was the Chinese entity and the debtors, the appellees were, you know, it was an operating company and then I think six single asset real estate entities. They were never making money, ever. And it was never the intention or the plan that they would be self-sufficient until the development occurred and they could start generating sales and revenue. But this thing was, the notion that there was some, something amiss here or they had faith because these things weren't cash flowing or they were operating at a loss. They always had been and that, of course, is the nature of this business. It had always been funded by the owner and there was no clearly defined communication by the owner that is in the record as of the date this thing closed that the owner was going to stop doing what it had always done. So, you know, was there a continuum? I mean, if you, if you look, there is even, there's even evidence in the record that, and I believe it's at Exhibit 39, that as late as like December 9th, the, the appellees themselves were projecting significant infusions of equity. You know, something like 500,000 in January. It is, it's, it's Exhibit 39 and I can certainly point the court to it, but, of the exact page number, but it's a short exhibit and it's a, it's a projection that the debtors themselves did that showed money coming in to fund this thing all through 2020. So, I, I think it is the wrong way to look at this thing to say that before this deal was done, everybody knew it was dead in the water. That makes no sense and there isn't evidence to support it. Can I come at it slightly differently? Absolutely. What I took from Judge Brand's question and it was mine too, is there's an analytical difference between some of these conditions, right? I mean, some of them really are snapshots and you're right. And Judge Ferris, for example, found we can, I cannot get there on a basic balance sheet and solvency test because some things just can't clearly be allocated, so forget that. I think you could argue the same thing on reasonably, on reasonably small capital. That might be a snapshot too. But this whole, you know, intended to incur or would incur strikes me as analytically different and much more open to some kind of like a sort of, for lack of a better word, kind of a pastiche where there's different, you know, different pieces you look at and then you just form an impression. So, do you think I have that right or do you think I'm being overly liberal? I don't want to tell you you're wrong. Well, why not? But I can only tell you the way I look at it and I think analytically, I look at these things, the two, you know, the two non-balance sheet tests. Yeah. Here, at least, being driven by the same underlying critical factual determination and that is, was the parent here, were the Chinese affiliates going to, as of the closing date, was there a reasonable expectation that by the appellees, that they were going to continue to be funded by the parent as they always had been? And if they were, if there was a reasonable expectation of continued equity coming in through 2020, and again, I would appoint you to exhibit 39 of the appellants opening appendix. Yeah. Then, you can't, I think you can't legitimately say that it was either inadequately capitalized or that there was a belief that debts wouldn't be paid as they became due because it was the equity infusions and there's no controverting evidence. It's all, it's acknowledged throughout the evidence that it was only those equity infusions that ever enabled the appellees to pay any of their, you know, to continue operations. They never could have operated without those infusions. So, can I kind of frame it in a way? I think Mr. Sousa is going to tell me, oh, no, there is evidence to the contrary about why there would be some doubt here. And then the question becomes, well, what does Judge Ferris do with that? I mean, how do you get to the answer when some things may break one way and some things may break another way? And I know you're telling me you don't think there's anything in the record that breaks the other way, but I think he's about to tell us why that may not be entirely right from his viewpoint. And then the question is, well, what does Judge Ferris do with that? Okay. So, I think the way that the appellees have argued this in their papers is that, you know, this is the two permissive views kind of concept, which is, you know, which means if there's two permissive views, I lose on appeal. Yeah. I acknowledge the principle. I don't think it flies here. Got it. And the reason it doesn't fly is, I mean, that is, that's the sin cuanon of what we have here. And I think Mr. Musi is going to say, has said in his answer in brief, that there's an attempt to justify the failure to meet the burden of proof on these two issues by characterizing the failure as an ambiguity for which there are two permissible views. And I think that boils down to the evidence, you know, that there's evidence that some conversation took place here in Q4. I mean, that's all over the evidence. Mr. Chang said, yeah, the conversation took place in Q4. So, that that can properly be construed or interpreted by the bankruptcy court and by this panel to mean that it took place before December 11, because that's one of two permissible interpretations of Q4. But I think that that just ignores and it completely excuses a failure to meet the burden of proof. The party with the burden has to show that its version occurred, not just that it's possible. All they've done here is show it's possible. They haven't showed that it actually happened. Well, they don't know it's more likely than not, right? Because it's a preponderance of the evidence. Okay, let's take a look at it. By the way, Mr. Brown, you're a little under three, so tell me what you want to do. Tell us what you want to do. For all my time, I've already gone for over 10 minutes? Yes, sir. Okay, I'd like to answer the question that's before me, and then I'd like to have the court ask me any other questions that it has. Okay. And then I'm going to stop with respect to the rest until... Okay, so the question, I'm sorry, could you ask it again? It was, the standard is more likely than not, right? Because it's a preponderance of the evidence. So they have to prove it exactly. They don't have to prove it exactly. They have to prove it's more likely than not. But Q4, I just don't see how a statement that we were told in Q4 makes it more likely than not that it happened before December 11th. I mean, if you look at it in terms of, well, there's 31 days in December, it's actually more likely than not that it didn't happen before. So, I mean, how, all I would pose is, how do you come to the conclusion Q4 means more likely than not on or before December 11th? The other thing I would say on this is that the only evidence that any, putting aside the precision on the timing, the only evidence that any conversation happened between Vivian Chang, you know, is Vivian Chang telling Mr. Chang, you know what, these infusions are going to slow down substantially. They're going to stop. Q4. The only evidence that even occurred is pure hearsay. It was objected to, it was hearsay in Chang's written direct testimony. That was objected to in written objection submitted before trial. Judge Ferris overruled the hearsay objection to Mr. Chang's testimony about what Vivian told him and said, it's all going to the weight. And then he went ahead and gave it full weight, because it's the only evidence that the conversation ever occurred. Mr. Musi has argued, and he may tell you on his oral argument, that well, but the evidence came in at trial anyway, so no harm. That's not the way it works. The objection was overruled. So, you know, what are you supposed to do, object again? It was overruled. So, yes, it came in twice, but the objection was there and it was erroneously overruled. If you take out the hearsay, if that objection was granted, then there's no evidence, there's no admissible evidence of any conversation taking place in Q4. With that, I have four seconds left. Wow, that went fast. Okay, thank you very much. Okay, Mr. Musi? I guess good afternoon to you, good morning here. Just real briefly, let me jump to the evidence that Mr. Brown says doesn't exist. You know, first, I think there was some inaccurate characterization as to what Mr. Chang testified to at trial. He did indicate that in the third quarter, by the third quarter of 2019, the equity infusions were progressively smaller and less than was requested. That we indicate on page 20 of our brief with the sites. But the exhibit that I think puts the nail in the coffin that Mr. Brown is saying, there's no evidence that they were not expecting full funding as had previously occurred, is Plaintiff's Exhibit 40, which is Appendix 38 to Mr. Brown's brief at TDH Appendix 01036. And what that document is, is essentially a 90-day cash flow analysis. And on the cover sheet, it indicates the anticipated funding in for the three-month period of November 2019 through January of 2020 of $750,000. There's a total cash requirement of $3.5 million, current cash of $1.7 million. So, they're forecasting a very significant underfunding. I'm sorry, was someone going to ask a question? I don't know. Okay. So, at that point, there's evidence that they are not anticipating being fully funded. This is evidence that they have expenditures coming up. Those expenditures are identified. Certain of them are development expenditures that might be able to be deferred, but others are debts that are coming due at certain periods of time. And that's evidence that they are not going to get the capital to be able to pay those amounts and that they, once they enter into that transaction in December, that Judge Farris was perfectly within the inferences that he could come from the various testimony and the cash flow budgets, that they knew or reasonably should have known they weren't going to be able to pay these other debts as they came due because they were all based on essentially, you know, needing equity contributions that they knew wouldn't be coming. And they knew that certain amounts would be coming, but all of which was less than what was needed to pay the expenses that would be, that were going to be incurred. You know, I'd like to kind of just go, well, one more point on that. Mr. Brown talks about the hearsay and that there was an objection and then, you know, what were they supposed to do, object again. But the part that he's missing about that is TDH, when they were cross-examining Mr. Chang, they elicited that testimony themselves. That's in footnote six of our answering brief. So, they opened the door, they brought in some of that testimony, and then there was further testimony on redirect regarding those conversations that came in without any additional objections. So, you know, that evidence was in the record to the extent they had an objection. I think they waived it when they, you know, brought that testimony in themselves. Now, kind of just to double back to the start of this, you know, I think anyone that's kind of looking at this or any bankruptcy person that's looking at this, I mean, this is really your textbook constructive fraudulent transfer here. You know, we had a lender that had a different borrower in order for essentially a small extension on the loans. They wanted to make this borrower obligated for 56 plus million dollars of debt that they weren't previously obligated on. Yes, Judge Corbett? So, what did the debtor get from becoming obligated on this loan? It's our position that they didn't get anything. You know, they were in a very good position before, although they, you know, they didn't, they relied a lot on capital infusions. But, you know, they became in a much worse position from this transaction because now they had this 56 million dollars in debt and all their assets were encumbered. So, they couldn't really legitimately borrow to save their business going forward. It's argued that what was anticipated was that this would provide some relief to the Asian entities who then may be able to provide additional funding. But, there's no evidence that that was essentially going to occur. There is evidence that there was no new money out of this transaction and that, in fact, the debtors, Asian entities had to pay about 4 million in interest. So, you know, that took away some of the liquidity that otherwise could have come to these debtors. Had that loan defaulted, the Asian entities, you know, they would have had whatever remedies, TDH would have had whatever remedies they had over there in Asia. But, the debtors would have been able to continue to do business here in Hawaii. Assuming that they couldn't get those equity infusions, there is the possibility that they could have borrowed. They could have done some sort of asset-based lending because they had approximately, based on the tax assessed values, about 28 million dollars in equity. But, as a result of this transaction, they had no equity and an additional 56 plus million dollars of debt on their books. So, you know, it's our position that they got nothing of value out of this, nothing direct and nothing indirect. And, just again, you know, this case is, the only thing that's really being challenged here in this case are factual findings. And, as the courts indicate in their questions to Mr. Brown, you know, a very high standard that has to be met in order for those findings to be overturned. Can I turn my little pastiche metaphor that I used with Mr. Brown to you for a moment? Sure. On the good faith defense here, I realize that it's stated as something that's, quote, objective. And, it's a matter of, you know, if one was aware of facts that would indicate insolency, for example. Okay. So, it's not you have to prove they actually knew something. It's, you know, it's a different standard. And, it's arguably very different from what, for example, California state court cases are doing now under the UBTA where they're much more demanding. No, you've got to show me a real fact that this transfer is new. And, then, you know, then we're talking. But, in a similar way, when you look at the cases, the good faith cases under the federal statute, and I think, I don't know if Hawaii is any different. I don't suspect it is. You know, this is most easily posed when it's actual fraud. Because, then, what you have is a situation where once kind of the lights go on, it's, oh, my God. You know, and you don't even, you don't have to be colluding with the transfer law. But, if you are, obviously, you're not in good faith. But, the facts, once they are sort of out there, are so obvious that, well, then, you know, you can't be in good faith at that point. But, is it a little bit different when it's constructive? And, as Mr. Brown's papers pointed out, look, part of the story here is, you know, transferees being told everything's great. You know, projections are wonderful. This is a heck of a good project, so on and so forth. They may also have heard or be aware of some challenges. But, you know, how do we kind of, how do we assess that where, again, it's sort of a weighing kind of thing? Well, what's the right way to think of it? And, by the way, I think that, in the model and the case, Judge Pappas points out that this is just a whole lot harder when you're talking about constructive fraud than when you're talking about actual fraud. Yeah, I mean, I would agree with you on that. I think when there's that fraudulent intent, it kind of, you know, gets people's antennas up a little bit more and really, you know, makes it easier to find a lack of good faith. But I don't think just because it's constructive fraud, you know, that there's any higher burden that. It's just not as obvious. Yes, I agree with you on that. It may not be as obvious. I think here there was a confluence of a lot of different facts. I think just beyond insolvency, you run into, you know, there's case law that we cited that talked about vast imbalances between the value exchanged, you know, may make it difficult to establish a good faith requirement. A lack of an arm's length bargain could also indicate a lack of good faith. You know, here there was testimony that there was a lot of due diligence that was done by TDH before. There's evidence in the record of, you know, what that due diligence would have shown. You know, they tried to put in a lot of evidence that showed that there was all these equity infusions because the companies themselves couldn't, you know, couldn't really operate on their own without that equity. So, you know, they were aware of that, their discovery answers that indicated they were aware of financial hardships. You know, by looking at the financial information that was provided, they knew that these, you know, only one company had operating revenues and it was done at a loss. There was all these development expenses. Then when you combine that with the fact that there was no direct benefit that was given to the debtor from this transaction and, you know, while they've argued that there was significant indirect benefits, I think just the complete and utter difference in what was given by the debtors and what was received by the debtors, you know, would put anyone on notice that, hey, you know, this transaction itself, you know, requires some special looking into. And the other issue we have is essentially the lack of an arm's length bargain. I mean, here this transaction was forced on these debtors. You had these Asian entities. They were told that, hey, a condition to extending these loans is we get collateral from your Hawaii companies. So, you know, there was strong arming going by TDH that this had to happen in order for that essentially the loan extension to occur. So, there wasn't any negotiation. There wasn't any good faith borrowing. I mean, this was a demand and the demand, you know, ended up being met. That when you look at a confluence of all those events, that there is sufficient evidence in the record that Judge Farris could have found that they did not act in good faith. Just for the second, I guess, means of proving, you know, the insolvency, the knowing or should have known that they were going to incur debts beyond their ability to repay. You know, that's all based on a lot of the same evidence that we had for unreasonably small capitalization. They had projections of what all their expenses were going to be. They knew they weren't going to get sufficient equity infusions to meet them. And, you know, to the extent that they would have been able to obtain capital through borrowing this transaction in 2019, just essentially cut off any avenue for them to obtain borrowing that they wouldn't, they knew or reasonably should have known that they weren't going to be able to pay these additional debts as they came due. So, you know, while Mr. Brown has, I guess, taken liberties at characterizing the evidence and what he claims to be the lack of evidence, there was a significant amount of evidence that was put in regarding the debtor's financial condition when the debtor knew that it wasn't going to receive sufficient equity. And, you know, it was clear that there wasn't going to be sufficient cash flow either through operating income, continued equity infusions, and then eventually the inability to borrow as a result of this transaction that, you know, under either of those tests, Judge Farris's findings were not clearly erroneous. That they were based on a strong evidentiary basis. And, again, as Judge Brand pointed out, our burden is a preponderance of the evidence. More likely than not, that burden was adequately met. And then just, there weren't any questions on it, but I did want to address, Mr. Brown suggests in his brief that this, you know, matter should be sent back for some sort of hearing on, you know, value on the good faith defense. I think that's premature. That's, you know, the court never decided anything. There's no need for that to be cited before the court rules on the matters that are before it in this case. Well, if it's premature, when are we going to get to it? Well, I think, Your Honor, you would rule on this. No, but I guess he's saying that, you know, it should be sent back for some sort of ruling. But if the court upholds the ruling that there was a lack of good faith and there's no need to have that, you know, Judge Farris go through that exercise, it would be, you know, wouldn't further judicial economy to do as he's suggesting. So, with that, and the fact I have less than a minute, I would just, if the judges have any questions, I'd be more than happy to try and answer them. Thank you. Thank you both for your excellent arguments. The matter is submitted. Thank you. Okay, I think that concludes this session. This court is adjourned.
judges: Lafferty, Brand, and Corbit